El Pueblo de Puerto Rico, demandante y apelado, *v.* Cruz Arocho Medina, acusado y apelante.

Número: CR-64-188    Resuelto: 9 de febrero de 1966

*Adonis Nieves Rodríguez,* abogado designado por el Tribunal Supremo para ofrecer asistencia legal en apelación al acusado; *J. B. Fernández Badillo, Procurador General,* y *Manuel Tirado Viera, Procurador General Auxiliar,* abogados de El Pueblo.

PER CURIAM: El apelante Cruz Arocho Medina fue acusado y convicto de asesinato en primer grado y se le condenó a la pena de reclusión perpetua. En apelación apunta que el tribunal de instancia (1) erró y abusó de su discreción al encontrar a un niño competente para testificar, y (2) erró al encontrar al apelante culpable de asesinato en primer grado y sentenciarlo a cadena perpetua "sin haber tenido ante sí suficiente prueba". No tienen méritos estos apuntamientos por los fundamentos que relacionamos a continuación.

1.—Se impugna el testimonio del niño Juan Antonio Vélez, de ocho años de edad, porque no estaba mentalmente capacitado para declarar.

■ En *Pueblo* v. *Párquez*, 34 D.P.R. 566 (1925), y *Pueblo* v. *Rivera*, 12 D.P.R. 411, 420 (1907), dijimos que de acuerdo con el Art. 39 de la Ley de Evidencia (32 L.P.R.A. sec. 1733(2)) los niños menores de 10 años que parecieren incapaces de recibir impresiones exactas de los hechos respecto de los cuales fueron examinados, ni pudiesen relatarlos con exactitud, no podrán ser testigos y en tal virtud expresamos específicamente en *Pueblo* v. *Rivera*, supra, "parece lógico que antes de tomarse el juramento y recibírsele declaración, se haga por el tribunal alguna investigación de su capacidad, porque de lo contrario podían resultar ambas diligencias ineficaces y baldías con grave daño para la defensa del acusado por los prejuicios que puedan llevar al ánimo del jurado la declaración de un testigo inconsciente de la santidad del juramento y de la obligación que le impone de decir verdad, o que no se dé cuenta exacta de los hechos o no sepa exponerlos al tribunal con la debida exactitud y claridad . . . ." En *Párquez*, supra, dijimos que la decisión de esta cuestión "queda al buen criterio de la corte donde el juicio se celebra", y que "la misma no será modificada en apelación a menos que aparezca claro que fue errónea". También se sostuvo en este caso el permitir que una menor testificase sobre los hechos pertinentes de un caso luego de declarar, a preguntas del fiscal y del juez, que tenía ocho años de edad, que no sabía leer ni escribir, que no sabía lo que quería decir verdad ni lo que le pasaba al que no decía verdad ni al que no decía mentira; que decir la verdad era bueno y decir mentira era malo; que no sabía lo que es un juramento ni lo que quería decir declarar una cosa bajo juramento; "que viene a declarar hoy aquí lo que le hicieron; que va a decir en relación con esto la verdad; que si le ocurre un hecho lo contaría, diciendo lo que le hicieron, y que esto es decir ver-

dad; que su mamá no la ha castigado por decir verdad; que nunca ha dicho a su madre una mentira; que su mamá, con respecto a los que dicen mentira le dice que no diga mentira; que no sabe lo que le pasa a los que dicen mentiras pero que viene aquí a declarar lo que le ocurrió".

■ En el caso ante nos se siguió con fidelidad el procedimiento de cualificar al referido niño como testigo. A preguntas del fiscal dijo su nombre, edad, barrio donde vive, el grado en la escuela en que está; que vive con su papá, que su maestro es Mr. Arroyo; que va a la escuela por la mañana hasta las once y media; que almuerza en el comedor escolar; que Dios castiga a los nenes que dicen mentiras y su papá también; que las preguntas que dieron lugar a tales contestaciones no se las habían hecho antes; que algunas veces ha dicho mentiras pero al preguntársele si en el momento de testificar iba a decir la verdad o iba a decir mentira, contestó "La verdad". Al terminar el contrainterrogatorio del niño en la etapa de su cualificación, el juez de instancia determinó que el niño "Puede precisar y distinguir entre sitios; cuál es su hogar, cuál es su escuela, es decir, de barrios. Sabe quién es su padre, o por lo menos, que vive con su padre; quién es su maestra. Sabe precisar horas . . . . Y además que este joven tiene una superior extraordinaria franqueza de admitir que alguna vez no dice la verdad pero que hoy está determinado a decir verdad. Entendemos que el testifico cualifica . . .". La contestación del niño demostraba que tenía suficiente inteligencia y discernimiento; que entendía la diferencia entre decir verdad y decir mentira; que si decía mentira sería castigado por Dios y por su padre y que se daba cuenta de los hechos y sabía exponerlos con suficiente claridad y exactitud. Un examen del testimonio prestado revela, además, que el menor declaró en forma clara, lúcida y competente. No surge del récord, por lo tanto, que el tribunal de instancia hubiese

incurrido en error al determinar que el niño en cuestión cualificaba como testigo. (¹)

2.—Se ataca la suficiencia de la prueba. El caso se vio por tribunal de derecho. Ésta consistió en el testimonio de varios testigos que sintetizamos así:

1.—El Dr. Muñiz Núñez declaró que examinó el cadáver de Gerarda Feliciano Rosa, en el Hospital de Distrito de Aguadilla, el 27 de junio de 1962 (al día siguiente de su muerte); que éste mostraba laceraciones en manos, brazos y rodillas, heridas y fractura en la cabeza; que la causa próxima de su muerte fue asfixia por ahorcamiento; que la fractura se ocasionó con un arma contundente.

2.—El referido menor, Juan Antonio Vélez, testificó que vivía con su abuela Gerarda Feliciano y "porque la mataron" no vive con ella; que el día que la vio muerta, "amarrá" (señalando el cuello) con un "canto de jamaca" el testigo había salido a buscar agua al manantial y a buscar semillas de habichuelas para una sopa; que el apelante es primo suyo; que salieron juntos para la casa de la abuela de la casa de Confesor Montalvo; se pararon en una loma; el apelante le dijo que la abuela tenía $4,000; que el apelante le dijo que se iría a fiestar con el testigo; que llegaron a la casa de la abuela; que el testigo empezó a mondar una piña y el apelante se acostó en el piso; que la abuela se acostó en la "jamaca"; que salió a una tienda a comprar unos comestibles por encargo del apelante; que oyó dos gritos que salían de la casa de su abuela que él atribuyó al dolor de muelas de aquélla; que de regreso pasó por casa de Montalvo y regresó con éste a casa de la occisa; que al encontrar la abuela muerta Montalvo y el testigo fueron al cuartel de la policía de Isabela a declarar; que la abuela recibía un chequecito de $10.90 y los guardaba en el refajo que tenía puesto; nunca había visto mucho dinero en la casa.

(¹) Véanse: VI, Wigmore, *On Evidence*, sec. 1821 (3rd ed.); 1 Wharton's *Criminal Evidence*, sec. 7 (12th ed. 1955); cf. *Competency of young child as witness in a civil case*, 81 A.L.R.2d 386.

3.—Confesor Montalvo corroboró la declaración del menor y añadió que al llegar a la casa de la occisa encontraron la puerta del frente "trancá"; allí se quedó el testigo y el menor se fue a la puerta de atrás de donde salió gritando "mira dónde está"; que el testigo fue y vio a la abuela ahorcada de un tirante de la casa, a medio sentar en la puerta "Con los pies que caían en una cocinita, entonces con un canto de gravante sucio que lo guindaba de una solera de la casa; entonces quedaba así con los labios hinchados y un ojo negro"; que él le dijo al menor que irían a dar cuenta y a esos efectos fueron al cuartel de la policía de Isabela.

4.—Carmen Medina Feliciano, madre del apelante e hija de la occisa, declaró que como a las siete de la noche de los hechos vio al apelante en su casa cuando ya ella sabía que la mamá de la testigo se había ahorcado; que su esposo Faustino Arocho le informó ese hecho al apelante.

5.—Antonio Arocho Quiñones declaró que el apelante vino a su casa como a las 11:10 de la noche de los hechos y la pasó allí; que su casa queda lejos de la de los padres del apelante.

6.—Jesús Avilés Barreto, un detective, declaró que fue a casa del anterior testigo a cumplimentar una orden de arresto del apelante; que al acercarse a la casa vio al apelante parado a una ventana de la misma y que al desmontarse del *jeep* el testigo, y el detective Cabán que lo acompañaba, el apelante "se tiró corriendo por detrás de la casa por una pieza de caña y lo seguimos y corrimos como un kilómetro detrás de él y no le pudimos dar alcance". Dos días después el policía Rosado trajo al apelante al cuartel de la policía de Aguadilla; de allí lo llevaron al lugar de los hechos; cuando llegaron el apelante no quería entrar y de regreso "se nos dio a la fuga otra vez . . . hacia el monte"; lo persiguieron; le hizo dos disparos y siempre continuó corriendo y desapareció. Volvió a ver al apelante como a los tres o cuatros días después que lo trajo la policía de Isabela otra vez a Aguadilla.

7.—El Juez de Paz, Rodríguez Rivera, declaró que el

día de los hechos fue con el fiscal al lugar en que ocurrieron y vio a la occisa colgada de una parte de la casa, como a las once de la noche; investigaron lo sucedido, volvieron a Isabela donde interrogó al menor Juan Antonio Vélez y luego ordenó el arresto del apelante, orden que entregó a la policía de Isabela.

Se apunta que esta prueba no era suficiente para condenar, pues la mera presencia del apelante en el lugar de los hechos no es suficiente para sostener su convicción; que en este caso sólo hay una posibilidad, no una probabilidad, de que el apelante estuviera en el lugar de los hechos cuando se cometió el crimen; que el mero hecho de darse el apelante a la fuga tampoco es suficiente para crear una presunción de culpabilidad; que dichas fugas son indicativas de su confusión mental; que la evidencia circunstancial aducida en este caso no es de naturaleza concluyente.

■ Convenimos con el Procurador General que la prueba resumida a la cual dio crédito el juez sentenciador, incrimina suficientemente al apelante para sostener su convicción. Dicha prueba estableció que el apelante tenía la creencia que su abuela guardaba mucho dinero, y el propósito de éste de irse a fiestar; que al salir el menor de la casa de la occisa se quedó el apelante en ella; que aquél oyó dos gritos de su abuela mientras se alejaba de la casa. Luego el apelante se fugó dos veces después de ser arrestado, la segunda vez luego de ser llevado a casa de la occisa y de negarse a entrar a la misma. Véanse: *Pueblo* v. *Vega Santos*, 88 D.P.R. 272 (1963); 1 Wharton's *Criminal Evidence*, sec. 205 (12th ed., 1955). A base de esta prueba concluimos que el tribunal de instancia estaba justificado en concluir que se había establecido la culpabilidad del acusado fuera de duda razonable. *Pueblo* v. *Romero y Navarro*, Sentencia de 16 de septiembre de 1965; *Pueblo* v. *Ramos Vélez*, (Per Curiam de 10 de marzo de 1964); *Pueblo* v. *Ruiz Vélez*, 85 D.P.R. 483 (1962); *Pueblo* v. *Bonilla Figueroa*, 83 D.P.R. 295 (1961); *Pueblo* v. *Bonilla*, 78 D.P.R. 152 (1955).

En vista de lo expuesto, *se confirmará la sentencia dictada en este caso por el Tribunal Superior, Sala de Aguadilla, en 31 de octubre de 1962.*

El Juez Asociado Señor Hernández Matos no intervino.